**Deborah Sullivan v. SSA**        CV-98-309-B    06/21/99

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Deborah A. Sullivan

    v.                                     Civil No. 98-309-B

Kenneth S. Apfel, Commissioner
Social Security Administration


## MEMORANDUM AND ORDER

_____Plaintiff Deborah Sullivan applied for Social Security Title II disability benefits and Title XVI Supplemental Security Income (SSI) benefits on October 4, 1995.  The SSI application was assigned a protective filing date of September 21, 1995. Sullivan's applications were denied initially and on reconsideration by the Social Security Administration (SSA).  An Administrative Law Judge (ALJ) considered the case de novo and, on August 16, 1996, determined that Sullivan was not disabled.

The Appeals Council denied Sullivan's request for review on April 23, 1998.  Sullivan filed her motion in this court on May 12, 1998.  Because I find the ALJ's factual findings supported by substantial evidence, I affirm.

# I. BACKGROUND[1]

Sullivan was born on September 21, 1948. She has a high school education, and past relevant work as a cashier, sales associate, waitress, and assistant manager of a convenience store. She alleges a closed period of disability, due to hearing loss and a number of associated conditions, from September 1, 1993, until June 1996, when she resumed performing substantial gainful activity.

In 1976, Sullivan was treated at the Massachusetts Eye and Ear Infirmary for chronic eustachian tube dysfunction with serious otitis.[2] An audiogram taken at the time showed bilateral symmetrical conductive hearing loss of 40 decibels. A large attic perforation in her right ear was draining purulent material,[3] while a smaller attic perforation in her left ear had produced obvious cholesteatoma[4] in the epitympanum.[5] Plaintiff

---

[1] **Unless otherwise noted, facts are taken from the "Joint Statement of Material Facts" (Doc. 10) prepared by the parties.**

[2] Otitis is an inflammation of the ear, which may be marked by pain, fever, abnormalities of hearing, hearing loss, tinnitus, and vertigo. See Dorland's Illustrated Medical Dictionary, 1204 (28th Ed. 1994).

[3] "Purulent material" is composed of, or contains pus. See Dorland's Illustrated Medical Dictionary, 1098 (26th Ed. 1981).

[4] Cholesteatoma is a cyst-like mass or benign tumor with a lining of stratified squamous epithelium, usually of keratinizing

-2-

underwent right ear surgery in April 1976 which included a radical mastoidectomy,[6] canaloplasty,[7] and tympanoplasty.[8]  The procedures were repeated on her left ear in November 1977.

An audiological examination performed at the Massachusetts Eye and Ear Infirmary in October 1994 revealed that Sullivan "passed"[9] a word recognition test on the left ear, and achieved 88 percent recognition in her right ear.  The degree of her hearing loss was measured at 42 decibels in her right ear, and 50 decibels in her left ear.

In May 1995, Sullivan presented with heavy vaginal bleeding.

---

type, filled with desquamating debris frequently including cholesterol.  See Dorland's Medical Dictionary, 318 (28th Ed. 1994).

[5]  The epitympanum is the recess in the upper part of the tympanic cavity of the ear.  See Steadman's Medical Dictionary 588 (26th Ed. 1995).

[6]  Excision of the mastoid cells or the mastoid process of the temporal bone.  See Dorland's Medical Dictionary 993 (28th Ed. 1994).

[7]  Plastic reconstruction of a passage, as of the external auditory meatus.  See id. at 224.

[8]  Surgical reconstruction of the hearing mechanism of the middle ear, with restoration of the drum membrane to protect the round window from sound pressure, and establishment of ossicular continuity between the tympanic membrane and the oval window. See id. at 1767.

[9]  "Pass" is defined as achieving greater than 92 percent word recognition.  See Tr. at 144.

Her examining physician, Dr. Suzanne Coble, attributed the bleeding to menopause. In June 1995, Dr. Coble noted that Sullivan was at risk for coronary artery disease due to hypertension, cigarette use and family history. Sullivan was advised to reduce her smoking and evening alcohol consumption. Dr. Coble ordered an echocardiogram, which was normal. She began Sullivan on a course of Capoten,[10] and Proventil[11] and Aerobid[12] inhalers for presumed chronic obstructive pulmonary disease (COPD) and bronchitis.

In July 1995, Dr. Coble measured Sullivan's blood pressure at 176/100 on the right, and 170/100 on the left, increased Sullivan's Capoten dosage, and once again discussed Sullivan's cigarette use. Dr. Coble noted that she would refer plaintiff to an ear, nose and throat specialist and try to assist her in locating funding for hearing aids. By August 1995, Sullivan's blood pressure had dropped to 148/90. She was treated at Ear,

---

[10] Capoten is indicated for treatment of hypertension or heart failure. See Physician's Desk Reference 784 (52nd Ed. 1998).

[11] Proventil is indicated for the relief of bronchospasm in patients with reversible obstructive airway disease and acute attacks of bronchospasm. See id. at 2658.

[12] Aerobid is indicated as a prophylactic therapy in the maintenance treatment of asthma. See id. at 941.

Nose & Throat (ENT) Specialists of Southern New Hampshire, and it was noted that at the time of treatment, Sullivan was wearing a hearing aid that she interchanged between ears. Upon a review of her records, the ENT specialists noted that further surgery was an option to restore her hearing. Sullivan noted her inability to pay for such treatment, and she was advised to call Vocational Rehabilitation for assistance.

In September 1995, Dr. Coble noted that Sullivan's blood pressure had been successfully controlled on Capoten, and Sullivan reported that she was using a Ventolin inhaler as needed for her asthma. In October 1995, Dr. Coble changed Sullivan's blood pressure prescription to Norvasc,[13] and prescribed Folate for Sullivan's anemia.

Sullivan underwent pulmonary function testing in November 1995, which revealed normal airflow in her large airways without bronchodilator response, and mild small airway obstruction with bronchoreactivity.

In January 1996, Sullivan's blood pressure had rebounded to 180/80 and was reported as no longer well-controlled. She was

---

[13] Norvasc is indicated for the treatment of hypertension. See id. at 2195.

started on Cardura.[14]  The dosage was increased in February 1996.

On March 22, 1996, clinical neuropsychologist Dr. Donna Z. Kelland conducted a psychological evaluation of Sullivan, and reported that "Ms. Sullivan's major presenting problem was reported as being poor health, which she [Sullivan] described as being severe in degree of psychological disturbance.  The presenting problem has occurred over the past several years and reportedly has had a deleterious effect on the client's work performance and personal relationships."  Tr. at 215.  Sullivan told Dr. Kelland, "I tend not to want to be around people because I can't hear them."  Id.  Dr. Kelland noted that Sullivan required a hearing aid to complete the interview.  See id.

In her interview with Dr. Kelland, Sullivan reported frequent episodes of depression and anxiety during the previous six months.  She also reported drinking approximately half a fifth of liquor per day, and that she had a five- to 10-year history of alcohol abuse which increased concurrently with her level of stress.  During the interview, Sullivan reported a recent change in her sleep pattern, marked by restlessness, and

---

[14]  Cardura is indicated for the treatment of hypertension. See id. at 2166.

-6-

using Xanax[15] to aid in sleep. She noted that the Xanax was ineffective, and that therefore, she increased her alcohol consumption to help her sleep. It appears that her significant stress level was, at least in part, related to caring for her ill and elderly mother.

In commenting on Sullivan's level of adaptive functioning, Dr. Kelland noted, "[i]n particular, her difficulty in adjusting to her hearing impairment and other social stressors (i.e. family conflict) appears related to increased anxiety, social withdrawal and increased alcohol consumption." Dr. Kelland noted, however, that Sullivan was capable of carrying out written and oral instructions if those instructions were within sensory range. Dr. Kelland diagnosed alcohol dependence and adjustment disorder with chronic anxiety, and recommended individual therapy, relaxation training, and substance abuse treatment.

In March 1996, Sullivan stopped taking Cardura because it made her feel ill. Dr. Coble noted that Sullivan's hypertension was uncontrolled, and she prescribed hydrochlorothiazide to replace the Cardura. This dosage was increased in April 1996.

_____

[15] Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety. See id. at 2294.

-7-

Sullivan finally received her new hearing aids in May 1996, after Vocational Rehabilitation authorized the payment. She did not get the hearing aids sooner because she could not afford them. Sullivan reported that prior to receiving the hearing aids, she had difficulty socially and on the phone, and that she withdrew from some of her normal life activities because she could not hear anyone. After receiving her new hearing aids in May 1996, however, Sullivan promptly began working for Easter Seals, and in the mailroom in the V.A. Hospital, reattaining a level of substantial, gainful activity in July 1996.

Sullivan reported that between September 1993 and October 1995, she worked 15 hours a week as a sales clerk. She pretended to hear people, but because of the background noise, she had trouble comprehending what people were saying to her. She had one hearing aid during this period, which did not sufficiently improve her hearing. Sullivan's work during this period, however, did not rise to the level of "substantial gainful activity," and she noted that she was able to keep this position because the owner was "tolerant" of her condition. She had no problems with concentration or following oral or written directions, however, and maintained a full range of daily activities during this period, including grocery shopping,

cooking and all other household chores, visiting relatives, and caring for her elderly mother.

## II.  STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits, and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision.  See 42 U.S.C.A. § 405(g).  My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence.  See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); 42 U.S.C.A. § 405(g). The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence.  See Irlanda Ortiz, 955 F.2d at 769.  Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'"  Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the ALJ has misapplied the law or has failed to provide a fair hearing, however, deference to the ALJ's decision is not appropriate, and remand for further development of the record may be necessary.  See Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Secretary of Health and Human Servs., 835 F.2d 937, 939 (1st Cir. 1987)("The [ALJ's] conclusions of law are reviewable by this court.")  I apply these standards in reviewing the issues Sullivan raises on appeal.

## III.  **DISCUSSION**

To establish entitlement to benefits under Title XVI of the Act, a plaintiff has the burden to establish that she is disabled within the meaning of the Act.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987); Deblois v. Secretary of Health and Human Servs., 686 F.2d 76, 79 (1st Cir. 1982).  To be considered "disabled," a plaintiff must not only prove that she is unable to return to her past work, but also that she is unable to perform any substantial gainful work in the national economy as the result of a medical condition which can be expected to last for a continuous period of 12 months or more.  See 42 U.S.C. §§ 416(i)(1), 423(d)(1).  This determination must consider the plaintiff's age, education,

-10-

training and work experience - the mere existence of a medical impairment is not enough.  See 42 U.S.C. § 423(d)(2)(A).  The impairment must be so severe, in combination with her vocational factors, to preclude any type of gainful activity.  See McDonald v. Secretary of Health and Human Servs., 795 F.2d 1118, 1129 (1st Cir. 1986); Thomas v. Secretary of Health and Human Servs., 659 F.2d 8, 9 (1st Cir. 1981).  If a plaintiff is partially but not totally disabled by her impairments, she is not disabled within the meaning of the Act.  See Rodriquez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965).

In evaluating a claim for disability benefits, the ALJ's analysis is governed by a five-step sequential evaluation process.[16]  See 20 C.F.R. § 404.1520 (1998).  In the case at bar, the ALJ began his analysis by concluding, at Step Two, that Sullivan did have a "severe impairment" as defined by 20 C.F.R. § 404.1521 and 20 C.F.R. § 416.921 - specifically, "severe bilateral hearing loss" which significantly interfered with her

_____

[16]  In applying this five-step sequential analysis, the Secretary is required to determine: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; (5) whether the impairment prevents the claimant from doing any other work.  See 20 C.F.R. § 404.1520 (1998).

ability to perform basic work activities. See ALJ Decision at 2-3 (Tr. at 13-14). At Step Three, the ALJ concluded that the plaintiff "does not have an impairment or combination of impairments which meets or equals the severity of any impairment listed in Appendix 1 to Subpart P." Id. at 3 (Tr. at 14). Accordingly, Sullivan's bilateral hearing loss was not significant enough that she could be found presumptively disabled at Step Three.

At Step Four, the ALJ evaluated Sullivan's "residual functional capacity to return to her past relevant work or any other work which exists in significant numbers in the national economy." Id. After reviewing the medical evidence, the ALJ concluded that Sullivan "has a moderate bilateral hearing loss that would affect her ability to work. . . [in that] [s]he could not be expected to perform work that required fine hearing or that was performed in noisy environments." Id. He further noted that Sullivan's bronchitis "is mild in nature and only minimally impacts her ability to work." Id. at 4 (Tr. at 15). Accordingly, the ALJ concluded that Sullivan would be limited to positions that did not require lifting and carrying more than 50 pounds occasionally, or 25 pounds frequently.

After reviewing all the evidence, the ALJ concluded that Sullivan's past relevant work as a cashier "is not normally performed in a noisy environment . . . does not require fine hearing . . . [and] does not require more than medium exertional activity." Id. at 5 (Tr. at 16). Accordingly, the ALJ concluded that the claimant's past activity as a cashier "is not precluded by the claimant's current residual functional capacity. Therefore, the claimant is not disabled within the meaning of the Social Security Act." Id.

I agree.

A.    **The ALJ properly considered all relevant evidence in reaching his decision**

Sullivan alleges that the ALJ ignored and misconstrued evidence in the record concerning her hearing loss and psychosocial problems. Specifically, she argues that the ALJ "failed to discuss . . . [her] social isolation, her inability to sleep and her psychological impairments. . . her reliance on alcohol to medicate herself. . . [and her] psychosocial problems, including the death of her brother from substance abuse; the deaths of an aunt, uncle and grandmother; and her attempt to care for her ill and aged mother." Pl. Mot. to Reverse and Remand at 11. There is no evidence in the record, however, that Sullivan

was diagnosed with any psychological, psychiatric, or other mental impairment, and Congress has explicitly barred a finding of disability premised on drug or alcohol abuse.[17] Accordingly, the ALJ properly concluded that Sullivan's stress stemming from the deaths of close family members and the burden of caring for her ill and elderly mother did not rise to the level of a disabling mental impairment under the Act.

The Commissioner's Listing of Impairments makes clear that hearing loss for purposes of establishing disability is evaluated in terms of hearing loss which is <u>not</u> restorable by a hearing aid. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 2.08. In order for a claimant to meet her burden to demonstrate that she is unable to perform her past relevant work, therefore, she must establish that her impairment is not remediable. See <u>Tsarelka v. Secretary of Health and Human Servs.</u>, 842 F.2d 529, 534 (1st Cir.

---

[17] Congress amended the Social Security Act on March 29, 1996, to preclude a finding of disability "if drug abuse or alcoholism would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." P.L. No. 104-121 §§ 105(a)(1) and (b)(1), 110 Stat. 847, 852-53 (1996). The "key factor" in determining whether drug addiction or alcoholism is material is whether the individual would still be found disabled if alcohol or drug use were to stop. See 20 C.F.R. § 404.1535 (1997).

Congress noted that this provision was to apply to any case which had not yet been decided when the changes were enacted. See P.L. No. 104-21 §§ 105(a)(5)(A) and (b)(5)(A) as amended by P.L. 105-33 §§ 5525, 5528.

1988); <u>Torres Gutierrez v. Secretary of Health, Educ. and Welfare</u>, 572 F.2d 7, 8 (1st Cir. 1978)(poor vision correctable by eyeglasses not a basis for disability).  The fact that Sullivan returned to substantial, gainful activity after getting new hearing aids confirms the ALJ's finding that she was not irrestorably disabled.

Sullivan also alleges that the ALJ was mistaken in using a hearing loss of 90 decibels or greater as a benchmark.  The record shows, however, that the ALJ made this reference in discussing whether Sullivan could be found presumptively disabled at Step Two.  A hearing threshold of 90 decibels or greater would make Sullivan presumptively disabled, and would require no further inquiry.  <u>See</u> 20 C.F.R. Part 404, Subpart P, Appendix 1, § 2.08.  Accordingly, the ALJ's use of this standard was proper.

Finally, Sullivan argues that the ALJ internally contradicts himself by at times referring to Sullivan's hearing loss as "severe," while at other times calling it "moderate."  The distinction, however, arises because the term "severe" is a term of art in the lexicon of Social Security law denoting a <u>de minimus</u> threshold for continued inquiry after Step Two of the five-step sequential evaluation process.  <u>See</u> 20 C.F.R. § 404.1520 (1998); <u>Gonzales-Ayala v. Secretary of Health and Human</u>

<u>Serv.</u>, 807 F.2d 255 (1st Cir. 1986). The ALJ's use of the term "severe" at Step Two of the sequential evaluation process simply denoted that he considered Sullivan's impairment to be more than minimal, and requiring continued inquiry at Step Three. There is, thus, no inconsistency between this assessment and his later substantive evaluation of Sullivan's hearing loss as "moderate."

**B.    <u>The ALJ properly concluded that Sullivan could perform her past relevant work during the closed period of her disability</u>**

Sullivan argues that the ALJ's analysis of her impairments failed to consider their combined deleterious effect on her ability to perform her former work as a cashier during her alleged closed period of disability. She notes that "[e]ven if no one impairment is severe enough, a combination of several may render a claimant disabled and unable to work." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996); <u>Johnson v. Sullivan</u>, 922 F.2d 346, 351-52 (7th Cir. 1990); <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989). Sullivan's testimony, however, suggests that her on-the-job difficulties were solely related to her hearing loss. <u>See</u> <u>generally</u> Tr. of ALJ Hr'g at 1-9 (Tr. at 24-33). She also testified that she was able to work two days a week during the closed-period of her disability, before she received her new hearing aids, <u>see</u> Tr. at 31, and noted in a

questionnaire that her reduced working hours are due to the "_frustration_ of not hearing properly." <u>See</u> Tr. at 79 (emphasis added). Her treating physician notes, in a report submitted subsequent to the hearing before the ALJ, that "client's social interactions are mildly affected by current psychological difficulties. . . [and that] [t]he client is not likely to have significant difficulty in accomplishing basic activities related to work due to psychological issues." Tr. at 218. Further, Sullivan's physician notes, "[s]he appears capable of understanding, remembering, and carrying out written and oral instructions, if the latter are within sensory range." <u>Id.</u>

Sullivan was performing her past relevant work even during the closed period of disability (just not for enough hours to constitute substantial, gainful activity). Given that fact, the reports by her treating physician, and the fact that Sullivan's hearing was restored with hearing aids to the point that she now engages in substantial, gainful employment, I find that the ALJ's conclusion that Sullivan was capable of performing her past relevant work during the alleged closed period of disability was supported by substantial evidence. <u>See</u> <u>Tsarelka</u>, 842 F.2d at 534 (a remedial impairment cannot form the basis for disability).

## C. The ALJ properly evaluated Sullivan's subjective complaints

In evaluating Sullivan's residual functional capacity, the ALJ weighed Sullivan's subjective complaints and considered the degree of incapacity asserted by Sullivan. A plaintiff's subjective assertions, however, must be evaluated against the objective evidence, and not simply accepted blindly. See Thompson v. Califano, 556 F.2d 616, 617 (1st Cir. 1977). Subjective allegations are properly rejected where the objective medical evidence does not substantiate the alleged subjective limitations. See Bianchi v. Secretary of Health and Human Servs., 764 F.2d 44, 45 (1st Cir. 1985). An ALJ, however, is not free to simply accept or reject a claimant's subjective complaints on the basis of an "intangible or intuitive notion about an individual's credibility." Instead,

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently scientific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision. . . .

S.S.R. 96-7p.

Accordingly, in addition to evaluating the medical evidence, the ALJ heard and evaluated testimony from the plaintiff about her daily activities, the frequency and duration of her functional restrictions, medications, and prior work record. See Avery v. Secretary of Health and Human Services, 797 F.2d 19, 22 (1st Cir. 1986). The ALJ noted that Sullivan reported, in an October 1995 questionnaire, that she was able to grocery shop, cook meals, do household chores, visit with relatives, and help her mother with shopping and housecleaning, all with no difficulty concentrating, or following written or oral instructions. See Tr. At 77-79. The ALJ also noted that Sullivan was actually performing her job for two days a week before she got her new hearing aids, suggesting that her limitations were not as complete as she alleges.

The ALJ is charged with the duty to weigh this evidence, to resolve material conflicts in testimony, and to resolve the case accordingly. See Richardson v. Perales, 402 U.S. 389, 400 (1971); Tremblay v. Secretary of Health and Human Serv., 676 F.2d 11, 12 (1st Cir. 1982). The ALJ's findings must be upheld if they are supported by substantial evidence, even if the reviewing court, in a de novo hearing, might have found otherwise. See Lizotte v. Secretary of Health and Human Serv., 654 F.2d 127, 128

(1st Cir. 1981).  After a complete review of the evidence in the record, including Sullivan's subjective complaints, I find substantial evidence to support the ALJ's conclusion that Sullivan's activities during the alleged closed period of her disability, including her successful social interactions and her part-time work as a cashier in a noisy environment, do not substantiate a totally disabling impairment.

## IV.  <u>CONCLUSION</u>

Because I have determined that the Commissioner's conclusion that Sullivan was "not disabled" during the alleged closed period of disability from September 1, 1993, until June 1996, is supported by substantial evidence, I affirm. Accordingly, Sullivan's motion to reverse and remand (Doc. 7) is denied, and defendant's motion for an order affirming the commissioner (Doc. 9) is granted.  The clerk shall enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

June 21, 1999

cc:  Raymond J. Kelly, Esq.
     David L. Broderick, Esq.